6-22-2009: Historical Cell-Site Information
EAG:NS
F.#2013R00409

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# 13 MISC 603

- - - - - - - - - - - - - - - - - - - - - x
IN THE MATTER OF AN APPLICATION          :
OF THE UNITED STATES OF AMERICA          :      SEALED APPLICATION
FOR AN ORDER AUTHORIZING THE RELEASE     :
OF HISTORICAL CELL-SITE INFORMATION      :
- - - - - - - - - - - - - - - - - - - - - x

Nadia I. Shihata, an Assistant United States Attorney

for the Eastern District of New York, hereby applies to the Court

for Orders pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing

that within seven days Sprint (the "service provider") disclose

recorded information identifying the base station towers and

sectors that received transmissions from (516) 423-3813, a

telephone issued by the service provider and subscribed to by

DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New

York 11213 (the "SUBJECT TELEPHONE"), at the beginning and the

end of calls or text message transmissions, and the mobile

switching center serving the SUBJECT TELEPHONE during any calls

or text message transmissions, for the period from May 1, 2013 to

August 1, 2013 (collectively, "the HISTORICAL CELL-SITE

INFORMATION").

In support of this application I state the following:

1.    I am an Assistant United States Attorney in the

Office of Loretta E. Lynch, United States Attorney for the

Eastern District of New York.  As such, I am a duly-authorized

representative of a "governmental entity" under 18 U.S.C.
§ 2703(c) and (d) and, as such, am authorized to apply for Orders
authorizing the disclosure of the HISTORICAL CELL-SITE
INFORMATION.

2.    The Court is authorized to order the disclosure of
the HISTORICAL CELL-SITE INFORMATION upon the government offering
specific and articulable facts showing that there are reasonable
grounds to believe that the information sought is relevant and
material to an ongoing criminal investigation.  18 U.S.C.
§ 2703(d).

3.    I have discussed this matter with a special agent
of the Federal Bureau of Investigation (the "investigative
agency"), who is involved in the investigation.  Based upon my
discussion with the agent, I believe that the information likely
to be obtained is relevant to an ongoing criminal investigation
as required by 18 U.S.C. § 2703(d).  First, the investigative
agency is conducting a criminal investigation into possible
violations of federal criminal laws, including extortion and
conspiracy to commit extortion, in violation of 18 U.S.C. § 1951.
Second, it is believed that DENIS NIKOLLA, REDINEL DERVISHAJ, and
others known and unknown, have used the SUBJECT TELEPHONE in
furtherance of the above offenses.  Third, HISTORICAL CELL-SITE
INFORMATION will further the investigation by corroborating
information obtained from witnesses; helping to identify the

2

location of the targets and their co-conspirators at the time the crimes occurred, as well as the meeting places used by the targets and their co-conspirators, and the geographic breadth of the conspiracy, and providing leads as to the location of evidence.

4.      Based upon discussions with a special agent of the investigative agency, the government hereby sets forth the following specific and articulable facts showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation.

5.      The investigation has revealed, among other things, the following. John Doe #1 owns a pizzeria in Little Neck, New York (hereinafter, the "Queens Pizzeria") and a seafood restaurant in Astoria, New York (hereinafter, the "Astoria Restaurant").  John Doe #1 has advised the following, in substance and in part:

a.      John Doe #1 has owned the Queens Pizzeria for approximately two years and opened the Astoria Restaurant in or about May 2013.

b.      The Astoria Restaurant uses and sells food items and products that were transported from, and/or manufactured, outside the state of New York.

c.      On or about the afternoon of May 11, 2013, an employee of the Queens Pizzeria informed John Doe #1 that a man

3

had entered the Queens Pizzeria and asked to speak with John Doe #1. John Doe #1 subsequently entered the dining area of the Queens Pizzeria and spoke with the man, an Albanian male, who introduced himself as "REDINEL DERVISHAJ." During their conversation, DERVISHAJ stated that (1) John Doe #1 would have to pay DERVISHAJ $4,000 per month because John Doe #1 had recently opened the Astoria Restaurant in "our neighborhood;" (2) if John Doe #1 did not know who DERVISHAJ was, John Doe #1 should look DERVISHAJ up on the Internet;[1] (3) DERVISHAJ knew that John Doe #1 had a brother who owned a liquor store in Massachusetts who had lots of money; and (4) DERVISHAJ was going to send two men to the Astoria Restaurant that evening and John Doe #1 needed to take care of them.

        d.    Following this encounter, on or about May 11, 2013, John Doe #1 called (347) 392-0246[2] (hereinafter, the

---

[1]     A "Google" search for "Redinel Dervishaj" results in articles from various media outlets showing photographs of DERVISHAJ and revealing the following information regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher knife on Staten Island, New York, during Lacertosa's engagement party. Lacertosa died from his injuries. In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ for Lacertosa's murder, after viewing video surveillance footage of events leading up to the stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

[2]     Telephone records indicate that (347) 392-0246 is a mobile telephone subscribed to by BESNIK LLAKATURA at an address in Staten Island, New York.

"LLAKATURA Cell Phone") and spoke with his friend, BESNIK
LLAKATURA, a New York City Police Department ("NYPD") officer of
Albanian descent.  LLAKATURA advised John Doe #1 that DERVISHAJ
and others extort various Albanian establishments in Astoria and
that John Doe #1 opened the Astoria Restaurant in "their
neighborhood."

        e.    John Doe #1 has known BESNIK LLAKATURA for
many years and previously lived with LLAKATURA.  As a result,
LLAKATURA knows personal details regarding John Doe #1, including
John Doe #1's mobile telephone number and the fact that John Doe
#1's brother-in-law lives in Massachusetts and owns a liquor
store there.

        f.    On or about the evening of May 11, 2013, an
employee of the Astoria Restaurant informed John Doe #1 that two
men came to the Astoria Restaurant looking for John Doe #1 when
John Doe #1 was not there.  Thereafter, at approximately 10:41
pm, John Doe #1 received a call on his mobile telephone from a
telephone number with area code 718 (hereinafter, "718 Telephone
Number 1").[3]  According to John Doe #1, the person who called him
from 718 Telephone Number 1 identified himself as "Redinel" and,
in Albanian, reiterated that John Doe #1 had opened his

_____

    [3]    Records checks reveal that 718 Telephone Number 1
belongs to a pay phone located in Astoria, New York.

restaurant in "our neighborhood" and, as a result, John Doe #1 would have to pay "us."

g. Prior to May 11, 2013, John Doe #1 had never met REDINEL DERVISHAJ. At no point during their May 11, 2013 encounter did John Doe #1 provide DERVISHAJ with his mobile telephone number.

6. Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #1's account of what transpired on the afternoon of May 11, 2013. The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 pm[4] and speaking with an employee behind the pizza counter. The employee then walks away. Approximately 25 seconds later, John Doe #1 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered. John Doe #1 and the man sit together at a table in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria. Telephone records also confirm that John Doe #1 called the LLAKATURA Cell Phone at approximately 3:53 pm on May 11, 2013.

7. On or about March 23, 2013, DERVISHAJ was arrested in Queens, New York on a domestic violence charge. According to

---

[4] Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time-stamp from the footage is an hour behind the actual time (i.e., when the video footage indicates that it is 2:47 pm, it is actually 3:47 pm). The times set forth in paragraphs 6 and 11 reflect the actual time.

6

the NYPD Domestic Incident Report, DERVISHAJ's phone number is
(571) 337-7018. Telephone records indicate that (571) 337-7018
is a mobile telephone subcribed to by REDINAL DERVISHAJ
(hereinafter, the "DERVISHAJ Cell Phone"). Telephone records
reveal that the LLAKATURA Cell Phone called the DERVISHAJ Cell
Phone at approximately 3:13 pm on May 11, 2013 - approximately 34
minutes before DERVISHAJ visited the Queens Pizzeria on May 11,
2013 and approximately 40 minutes before John Doe #1 called
LLAKATURA to inform him of the extortion threats made by
DERVISHAJ. Telephone records also reveal that the DERVISHAJ Cell
Phone called the LLAKATURA Cell Phone on May 11, 2013, after
DERVISHAJ's visit to the Queens Pizzeria multiple times.

8.     According to John Doe #1, on or about the evening
of May 12, 2013, John Doe #1 closed the Queens Pizzeria, got into
his vehicle and began driving home. As John Doe #1 was driving,
he noticed a white Chevy Malibu sedan (hereinafter, the "Chevy
Malibu") following his vehicle. Thereafter, John Doe #1 observed
DERVISHAJ get out of the Chevy Malibu, knock on the front
driver's side window of John Doe #1's vehicle and state the
following, in Albanian, in substance and in part: "What happened?
You think you're a tough guy? You think you have balls of steel?
I want $4,000 for the restaurant per month." DERVISHAJ further
stated that John Doe #1's restaurant was going to be a "gold
mine" and that John Doe #1 had to pay "us." John Doe #1 reported

7

the license plate number of the Chevy Malibu to law enforcement personnel. Records checks reveal that the Chevy Malibu is registered to DERVISHAJ at an address in Queens, New York. Telephone records reveal that (1) the DERVISHAJ Cell Phone called the LLAKATURA Cell Phone at approximately 1:56 pm and 5:20 pm on May 12, 2013; and (2) the LLAKATURA Cell Phone called the DERVISHAJ Cell Phone at approximately 8:29 pm on May 12, 2013.

9.    According to John Doe #1, on or about May 14, 2013, at approximately 8:30 pm, John Doe #1 noticed the Chevy Malibu on the streets of Astoria, Queens. At approximately 10:30 pm, John Doe #1 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant. Thereafter, DERVISHAJ again demanded money from John Doe #1. John Doe #1 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license. DERVISHAJ nonetheless continued to demand payment, telling John Doe #1, in substance and in part, "you have to take care of us." Telephone records reveal that the DERVISHAJ Cell Phone called the LLAKATURA Cell Phone at approximately 8:04 pm, 8:22 pm, and 11:02 pm on May 14, 2013.

10.    John Doe #1 has advised the following, in substance and in part:

a.    On or about the evening of July 6, 2013, John Doe #1 closed up the Queens Pizzeria. As John Doe #1 exited the

8

Queens Pizzeria and proceeded towards his vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #1 noticed a black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street behind the Queens Pizzeria.

b.    John Doe #1 pulled out of the driveway and turned left onto the street, at which point he noticed at least three men inside the Dodge Charger.  Thereafter, the Dodge Charger began following John Doe #1's vehicle.  John Doe #1 noticed that the Dodge Charger did not have a front license plate.

c.    John Doe #1, who was driving on a narrow residential street, subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license plate.  As John Doe #1 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at which point John Doe #1 reversed his vehicle for approximately half a block and attempted to turn his vehicle around.  John Doe #1 was unable to turn his vehicle around, however, as his vehicle was too close to a street pole on the corner.  At this point, the driver of the Dodge Charger exited the Dodge Charger carrying a gun, ran towards John Doe #1's vehicle, and pointed his gun at John Doe #1, while yelling at John Doe #1.  John Doe #1 managed to escape the area and drove away.

9

d.    John Doe #1 has identified a photograph of
DENIS NIKOLLA as the driver of the Dodge Charger who pointed a
gun at John Doe #1 on July 6, 2013.

11.    Video surveillance footage in and around the
Queens Pizzeria shows that John Doe #1 closed the Queens Pizzeria
on July 6, 2013 at approximately 11:27 pm.    Video surveillance
footage also shows that a black Dodge Charger drove by the Queens
Pizzeria at approximately 9:47 pm, and was outside the front
entrance of the Queens Pizzeria from approximately 10:00 pm to
10:10 pm.    Within the next hour, the video surveillance footage
further shows a black Dodge Charger drive by the Queens Pizzeria
several times onto a side street.    The black Dodge Charger
captured by the video surveillance footage had no front license
plate.

12.    Records checks reveal that a black Dodge Charger
is registered to DENIS NIKOLLA in Florida.    A check of the NYPD's
Real-Time Crime Center License Plate Reader database indicates
that the Dodge Charger registered to NIKOLLA has been captured on
license plate reader cameras in New York City multiple times in
July 2013.

13.    According to John Doe #1, shortly after the above-
described incident with the Dodge Charger, at approximately 12:23
am on July 7, 2013, John Doe #1 received a phone call on his
mobile telephone from DERVISHAJ, using a telephone number

10

beginning with area code 718 (hereinafter, "718 Telephone Number 2").[5] According to John Doe #1, DERVISHAJ informed John Doe #1, in Albanian and in substance and in part, that DERVISHAJ had not forgotten about John Doe #1, that he knew what was going on and that John Doe #1 "got lucky this time."

14. Telephone records indicate that the SUBJECT TELEPHONE is a mobile telephone subscribed to by DENIS NIKOLLA at an address in Brooklyn, New York. Telephone records further show that on July 6, 2013 - the date that NIKOLLA displayed a gun to John Doe #1 - the SUBJECT TELEPHONE was in contact with the DERVISHAJ Cell Phone leading up to the gun incident at the following approximate times: 2:49 pm, 2:50 pm, 3:04 pm, 6:24 pm, 6:57 pm, 7:31 pm, and 8:36 pm. Telephone records also show that the SUBJECT TELEPHONE was in contact with the DERVISHAJ Cell Phone following DERVISHAJ's 12:23 am call with John Doe #1 on July 7, 2013 at the following approximate times: 3:56 am, 7:55 pm, 8:04 pm, 8:25 pm, 8:35 pm, and 10:43 pm.

15. At approximately 6:33 pm on July 7, 2013, LLAKATURA sent John Doe #1 a text message from the LLAKATURA Cell Phone, which stated "U are in deep shit u know. I dont want ur problems to become mine."

---

[5]     Telephone records reveal that 718 Telephone Number 2 belongs to a pay phone located in Astoria, New York, located approximately 0.6 miles from the Astoria Restaurant.

11

16.    On or about July 8, 2013, at approximately 9:46 pm,[6] John Doe #1 called LLAKATURA on the LLAKATURA Cell Phone, which call was consensually recorded. A review of the recording reveals that, during this call, LLAKATURA asked John Doe #1 what happened. John Doe #1 told LLAKATURA he did not know what to do and that "they" showed up with weapons. LLAKATURA asked John Doe #1 where he was and John Doe #1 indicated he was in New Jersey. LLAKATURA advised John Doe #1 to stay in New Jersey and not to come to New York until tomorrow. LLAKATURA further advised John Doe #1 that he would be in Astoria tomorrow and would see what to do then.

17.    At approximately 9:49 pm on July 8, 2013, John Doe #1 received a text message on his mobile phone from LLAKATURA, using the LLAKATURA Cell Phone, asking how far John Doe #1 was from LLAKATURA's house. In response, John Doe #1 sent a text message to the LLAKATURA Cell Phone at approximately 9:52 pm, indicating he was quite far from LLAKATURA's house. At approximately 9:53 pm, John Doe #1 received a text message reply from the LLAKATURA Cell Phone, stating, in sum and substance, "forget it then."

---

[6]    In a prior application dated July 16, 2013 seeking historical cell site information for the LLAKATURA Cell Phone and the DERVISHAJ Cell Phone (hereinafter, the "July 16, 2013 Historical Cell Site Application"), the start time of this call was mistakenly set forth as approximately 5:50 pm. The correct start time of the call is approximately 9:46 pm.

18.   At approximately 1:08 am on July 9, 2013, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone.  The text message advised John Doe #1 to tell the manager of the Astoria Restaurant to be careful tomorrow and not to be by himself

19.   On or about July 9, 2013, at approximately 10:19 am, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone, asking John Doe #1 to meet him in Staten Island, New York.  Thereafter, telephone records indicate that John Doe #1 spoke with LLAKATURA on the LLAKATURA Cell Phone.  According to John Doe #1, during their conversation, LLAKATURA provided John Doe #1 with an address in Staten Island at which John Doe #1 could meet LLAKATURA and, further, that "they" had another "crew" following John Doe #1 around and that they were "bad people."

20.   On or about the afternoon of July 9, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was physically surveilled by law enforcement agents.[7] John Doe #1 advised that the following transpired at the meeting, in substance and in part:

a.   LLAKATURA advised John Doe #1 that he was in a bad situation and that the individuals extorting John Doe #1

---

[7]   John Doe #1 was equipped with a recording device during this meeting, but the recording device malfunctioned and, as a result, the meeting was not recorded.

13

were bad people who could not be fought because they would hurt John Doe #1.

    b. LLAKATURA further advised that, on or about July 8, 2013, DERVISHAJ came to LLAKATURA's residence with two friends to discuss the amount of money they wanted from John Doe #1. LLAKATURA stated that DERVISHAJ wanted three months' payment from John Doe #1, for the three months the Astoria Restaurant had been open, totaling $12,000, by July 11, 2013. LLAKATURA told John Doe #1 that if John Doe #1 did not pay, John Doe #1 would be physically harmed. LLAKATURA further stated that the individuals extorting John Doe #1 had intended to wound John Doe #1 by shooting him on the evening of July 6, 2013.

    c. John Doe #1 told LLAKATURA that he could not come up with $12,000 by July 11, 2013, and would only be able to pay $4,000 by that date. LLAKATURA stated that he would speak with "them" and get back to John Doe #1.

    21. At approximately 7:48 pm on July 9, 2013, LLAKATURA sent a text message from the LLAKATURA Cell Phone to John Doe #1 stating "U have no problem do ur things."

    22. Telephone records indicate that, at approximately 10:41 pm on July 9, 2013, John Doe #1 received a telephone call on his mobile phone from the LLAKATURA Cell Phone. According to John Doe #1, during this phone call, LLAKATURA indicated that he was a few blocks away from the Astoria Restaurant and was going

14

to pass by, which LLAKATURA thereafter did. Video surveillance footage in and around the Astoria Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44 pm and thereafter speaking with John Doe #1 outside the Astoria Restaurant. John Doe #1 related that the following transpired during his meeting with LLAKATURA, in substance and in part:

a. LLAKATURA related that two Albanian men had come to see LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

b. According to LLAKATURA, one of the Albanian men then called DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA. LLAKATURA advised that DERVISHAJ told LLAKATURA that John Doe #1 must pay DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise DERVISHAJ would break John Doe #1's legs. LLAKATURA offered to loan John Doe #1 $2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

23. On or about July 10, 2013 at approximately 6:08 pm,[8] John Doe #1 called LLAKATURA on the LLAKATURA Cell Phone, which call was consensually recorded. A review of the recording reveals that, during this phone call, LLAKATURA asked John Doe #1

---

[8] In the July 16, 2013 Historical Cell Site Application, the start time of this call was mistakenly set forth as approximately 2:14 pm. The correct start time of the call is approximately 6:08 pm.

15

whether John Doe #1 would make the cash payment to DERVISHAJ himself or whether LLAKATURA should do so instead. John Doe #1 stated that he wanted to meet DERVISHAJ face-to-face. LLAKATURA stated that he also wanted to be present at the meeting with DERVISHAJ and advised John Doe #1 to meet LLAKATURA the next day in the afternoon.

24. At approximately 7:11 pm[9] on July 10, 2013, John Doe #1 called the LLAKATURA Cell Phone and spoke with LLAKATURA, which call was consensually recorded. A review of the recording reveals that, during the phone call, LLAKATURA and John Doe #1 discussed whether to meet with DERVISHAJ later that night or the next day. LLAKATURA told John Doe #1 that he would provide him with a $2,000 loan when they met, but that John Doe #1 would need to provide the rest of the money ($4,000). LLAKATURA and John Doe #1 ultimately agreed to meet the next day, after LLAKATURA got off from work, in Astoria, New York.

25. On or about July 11, 2013 at approximately 11:33 am[10], John Doe #1 called the LLAKATURA Cell Phone and spoke with LLAKATURA, which call was consensually recorded. A review of the

---

[9] In the July 16, 2013 Historical Cell Site Application, the start time of this call was mistakenly set forth as approximately 3:23 pm. The correct start time of the call is approximately 7:11 pm.

[10] In the July 16, 2013 Historical Cell Site Application, the start time of this call is mistakenly set forth as approximately 7:37 am. The correct start time of the call is approximately 11:33 am.

16

recording reveals that, during the call, John Doe #1 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA. LLAKATURA told John Doe #1 that they could meet later in the day, five minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #1 had. LLAKATURA stated that he would make sure nothing happened to John Doe #1 during the meeting with DERVISHAJ. LLAKATURA ultimately agreed to meet with John Doe #1 briefly in Staten Island, New York.

26. On or about the afternoon of July 11, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was consensually recorded. John Doe #1 advised that the following transpired during the meeting, in substance and in part:

a. LLAKATURA told John Doe #1 that John Doe #1 could open up a club with DERVISHAJ. LLAKATURA advised that the club would be in John Doe #1's name, but DERVISHAJ would be a partner in the club. In the event this transpired, LLAKATURA told John Doe #1 that for every $2,000 John Doe #1 made from the club, John Doe #1 would have to give DERVISHAJ $1,000.

b. LLAKATURA stated that he had spoken with DERVISHAJ and that, as long as John Doe #1 paid DERVISHAJ, John Doe #1 would be fine.

c. LLAKATURA stated that DERVISHAJ would search John Doe #1 when they met with DERVISHAJ later that night and

17

that DERVISHAJ expected another $6,000 payment by August 15, 2013.

d.     While discussing possible options with John Doe #1, LLAKATURA told John Doe #1 that if he went into witness protection, DERVISHAJ and his associates would hurt members of John Doe #1's family who reside in another state, and asked John Doe #1 what type of car John Doe #1's brother-in-law has.

27.     A review of the recording of John Doe #1's meeting with LLAKATURA on the afternoon of July 11, 2013 corroborates John Doe #1's account of what transpired.  In addition, the recording reveals that, during the meeting, LLAKATURA told John Doe #1 that DERVISHAJ would not call John Doe #1 because DERVISHAJ is worried that John Doe #1 might have the police involved.  LLAKATURA further indicated that he told DERVISHAJ to search John Doe #1 when they met.

28.     On or about the evening of July 11, 2013, John Doe #1 met with LLAKATURA in Astoria, New York, which meeting was physically surveilled and partially consensually recorded. According to the physical surveillance, John Doe #1 entered LLAKATURA's vehicle at approximately 6:03 pm.  John Doe #1 advised that the following transpired during the meeting, in substance and in part:

a.     John Doe #1 entered LLAKATURA's vehicle, at which point LLAKATURA handed John Doe #1 $2,000 in cash.

18

LLAKATURA subsequently received a telephone call on his mobile phone from DERVISHAJ, during which John Doe #1 overheard DERVISHAJ telling LLAKATURA where to meet him. Following this phone call, LLAKATURA told John Doe #1 to take everything out of his pockets and leave these items in LLAKATURA's vehicle. LLAKATURA and John Doe #1 then proceeded to meet with DERVISHAJ in Astoria, New York on an isolated street corner.[11]

> b. At the start of the meeting with DERVISHAJ, DERVISHAJ searched both John Doe #1 and LLAKATURA. DERVISHAJ then asked John Doe #1 what he had to say for himself. LLAKATURA told John Doe #1 to give DERVISHAJ the money, at which point DERVISHAJ gestered to slow down and asked John Doe #1 to get into DERVISHAJ's car – the Chevy Malibu – with DERVISHAJ. LLAKATURA remained outside the Chevy Malibu.

> c. While inside the Chevy Malibu, DERVISHAJ told John Doe #1 that he was lucky the other night and that John Doe #1 and the manager of the Astoria Restaurant should thank LLAKATURA. John Doe #1 then handed DERVISHAJ $6,000 in cash, at which point DERVISHAJ inquired about the rest of the money. John

---

[11] A review of the recording corroborates John Doe #1's account of what transpired, as set forth in paragraph 28(a). The recording captures DERVISHAJ's voice telling LLAKATURA where they should meet. In addition, telephone records indicate that the DERVISHAJ Cell Phone called the LLAKATURA Cell Phone at approximately 6:07 pm on July 11, 2013.

Doe #1 indicated that he was told he had until August 15, 2013 to come up with the rest of the money.

        d.    DERVISHAJ stated that, in the future, he would give John Doe #1 his telephone number, which John Doe #1 could use to contact DERVISHAJ, in the event John Doe #1 needed protection and, also, to make payments to DERVISHAJ. John Doe #1 then left the meeting location with LLAKATURA.

        29.    From May 1, 2013 to July 30, 2013, the SUBJECT TELEPHONE was in contact with the DERVISHAJ Cell Phone a total of 232 times. The first contact between the SUBJECT TELEPHONE and the DERVISHAJ Cell Phone during this period was on May 2, 2013. The last contact between the SUBJECT TELEPHONE and the DERVISHAJ Cell Phone during this period was on July 26, 2013.

        30.    Based upon the above proffer, the government requests that the Court issue Orders that provides, pursuant to 18 U.S.C. § 2703(c)(1) and (d), a directive to the service provider to supply within seven days the HISTORICAL CELL-SITE INFORMATION for the period from May 1, 2013 to August 1, 2013.

        31.    The government also requests that the service provider, and any other person or entity whose assistance is used to facilitate execution of the Orders be ordered not to disclose (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider and (c) the production of the HISTORICAL CELL-SITE INFORMATION, to the listed subscriber

for the SUBJECT TELEPHONE, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONE, or to any other person, unless and until otherwise ordered by the Court. Any such disclosure might endanger the life or physical safety of an individual; cause a target to flee from prosecution; result in the destruction of or tampering with evidence; risk intimidation of potential witnesses; and/or seriously jeopardize the investigation.

32.    No prior request for the relief set forth herein has been made except to the extent set forth above.  The foregoing is affirmed under the penalties of perjury.  See 28 U.S.C. § 1746.

Dated:    Brooklyn, New York
          August 1, 2013

Nadia I. Shihata
Assistant United States Attorney
(718) 254-6295

21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**13 MISC 603**

- - - - - - - - - - - - - - - - - - - - x
IN THE MATTER OF AN APPLICATION          :
OF THE UNITED STATES OF AMERICA          :        SEALED ORDER
FOR AN ORDER AUTHORIZING THE RELEASE     :        OF AUTHORIZATION
OF HISTORICAL CELL-SITE INFORMATION      :
- - - - - - - - - - - - - - - - - - - - x

This matter having come before the Court pursuant to an
application by Assistant United States Attorney Nadia I. Shihata,
an attorney for the Government as defined by Rule 1(b)(1) of the
Federal Rules of Criminal Procedure and a duly-authorized
representative of a "governmental entity" under 18 U.S.C.
§ 2703(c) and (d), requesting Orders pursuant to 18 U.S.C.
§ 2703(c)(1) and (d), directing that within seven days Sprint
(the "service provider") disclose recorded information
identifying the base station towers and sectors that received
transmissions from (516) 423-3813, a telephone issued by the
service provider and subscribed to by DENIS NIKOLLA at 161 Utica
Avenue, Apartment 2G, Brooklyn, New York 11213 (the "SUBJECT
TELEPHONE"), at the beginning and the end of calls or text
message transmissions, and the mobile switching center serving
the SUBJECT TELEPHONE during any calls or text message
transmissions, for the period from May 1, 2013 to August 1, 2013
(collectively, "the HISTORICAL CELL-SITE INFORMATION");

UPON REVIEW OF THE APPLICATION, THE COURT HEREBY
FINDS THAT:

Pursuant to 18 U.S.C. § 2703(c)(1) and (d), the government has offered specific and articulable facts showing that there are reasonable grounds to believe that the HISTORICAL CELL-SITE INFORMATION is relevant and material to an ongoing criminal investigation into possible violations of federal criminal laws, including extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951, being conducted by the Federal Bureau of Investigation (the "investigative agency"); now therefore,

IT IS HEREBY ORDERED, pursuant to 18 U.S.C. § 2703(c)(1) and (d), that the service provider shall supply to the investigative agency within seven days the HISTORICAL CELL-SITE INFORMATION for the period from May 1, 2013 to August 1, 2013;

Good cause having been shown, IT IS FURTHER ORDERED, that this Order and the application be sealed until otherwise ordered by the Court, and that the service provider, its representatives, agents and employees, and any other person or entity involved in facilitating this Order shall not disclose in any manner, directly or indirectly, by any action or inaction, the existence of this Order, the existence of the Order to Service Provider or the production of the HISTORICAL CELL-SITE INFORMATION to the listed subscriber for the SUBJECT TELEPHONE, the subscribers of the telephones initiating incoming calls to or

2

receiving outgoing calls from the SUBJECT TELEPHONE, or to any other person.

Dated:      Brooklyn, New York
            August 1, 2013

                              s/Steven M. Gold
                         _____
                         THE HONORABLE STEVEN M. GOLD
                         UNITED STATES MAGISTRATE JUDGE
                         EASTERN DISTRICT OF NEW YORK